# CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed May 19, 1925.

H. MILTON GROSS AND SYBILLA W. GROSS, HIS WIFE,
VS.
CLARENCE E. DAVENPORT.

*Young & Crothers* for plaintiffs.
*Robert R. Carman* for defendant.

STANTON, J.—

The bill of complaint in this case prays for a mandatory injunction directing the defendant, Davenport, to remove the concrete wall and the dirt filling on the lot of Davenport between the concrete wall and Ayrdale avenue, or so much thereof as may be necessary to allow the surface water to flow in its natural course over the lot of Davenport.

The plaintiff and the defendant are adjoining lot owners. The property of each is on the south side of Barrington road. The lot of Mr. Gross beginning on the south side of Barrington road at a distance of sixty feet westerly from the corner of Ayrdale avenue, and running thence on the south side of Barrington road sixty feet; thence south, parallel with Ayrdale avenue with an even depth of one hundred and sixty-eight feet. The lot of Mr. Davenport begins at the corner formed by the intersection of the south side of Barrington road and the west side of Ayrdale avenue and runs west, binding on the south side of Barrington road, sixty feet; thence south, parallel with Ayrdale avenue with even depth of one hundred and sixty-eight feet. Each of said lots is improved by a frame bungalow in which the respective parties reside.

The evidence discloses that from a point on the south side of Barrington road, three hundred feet west of the corner of Ayrdale avenue and Barrington road, there is a fall in the grade towards Ayrdale avenue of about eight feet. The plaintiff claims that the natual fall of the land, and, of necessity the flow of surface water, is from the west towards the east or northeast, as a result of which the surface water on the rear of the lots as far west as No. 3809 Barrington road flows, and should be permitted to flow as a matter of right, over the rear of the lot at the corner of Ayrdale avenue and Barrington road, which is the Davenport property.

The evidence discloses further that ever since this property has been improved, (certainly since it has been owned and occupied by the defendant), the flow of the water has been over the

rear of his lot, and the effect has been to cut gulleys in the surface, and to wash away his top soil, and the subsoil at different points, so that the surface soil of his lot would be carried to the east, and cover the concrete sidewalk which runs along the east side of his property on Ayrdale avenue.

This condition in the winter time, resulting from the flow of surface water over the rear of the Davenport lot, coupled with the overflow from the unpaved street bed and gutter in Ayrdale avenue causes a solid mass of ice, covering practically the entire rear portion of his lot, as well as the greater portion of the sidewalk, between the easternmost line of his lot and the curb.

To correct this condition, Messrs Davenport and Gross had a conference. Mr. Davenport fixes the time as being in the spring of 1922, while Mr. Gross fixes the time as about November, 1922. But the defendant, Davenport, says that Mr. Gross manifested little or no interest in the existing conditions, and after further inconvenience on the part of Mr. Davenport he concluded to remedy the condition. He had erected in May of 1923, a concrete wall, beginning at the southwest corner of his lot, and running north on the dividing line, to a point about opposite the south wall of his bungalow. Then, subsequently, he had dug a blind ditch from the northernmost end of his concrete wall, and continuing to the front line of his property, so as to carry off the water which might back up against the wall, or flow over his front lawn; and thereby avoid any damage either to Mr. Gross or himself from the accumulation of water alongside of the concrete wall.

The plaintiff complains that, as a result of the erection of this wall, water has accumulated on his lot to a depth almost equal to the height of the wall. And on two occasions, at least, has so far covered the area of the back of his lot, as to run into the cellar of his home. This condition is said to have occurred in the late winter of 1923-1924, during which time we had heavy snowfalls, as well as considerable rainfall. Since the blind ditch has been dug by the defendant there has not been a repetition of the flooded cellar. But the complaint of the plaintiff is that even now, in times of heavy rainfall, there is an accumulation of water along the concrete wall on the Gross lot, which extends to the west of his lot, and has caused the surface to be soft and muddy; and makes it almost impossible to use portions of the rear lawn for hanging out laundry, and has destroyed the sod and has made the soil so wet that no grass seed will germinate. Now, it is this condition that has brought about the controversy in this case.

The two cases which have been relied on in the argument as coming from the Court of Appeals of this State are the Philadelphia, Wilmington and Baltimore Railroad Company vs. Davis, 68th Maryland, page 281, and City Dairy Company vs. Sallie H. Scott, 129th Maryland, page 548.

An examination of the records of these cases discloses that neither one of them has in them the facts found in the present case. The case of P., W. & B. Railroad Company vs. Davis is relied upon by the plaintiff as a ground for relief. But this case was an action at law against a railroad company for obstructing an open gutter or water channel which carried surface water from higher ground along the south side of the Davis house. The case of the City Dairy vs. Scott was also an action at law for damage to property by causing water to flow or back up on the land of an adjoining owner, as a result of an effort to get rid of water which had accumulated in a pool or pond, and the filling of the pond had changed the surface of the soil.

It appears to this Court that the precise question to be decided in this case has never been considered by the Court of Appeals of this State. And the decisions in other jurisdictions are very conflicting. The confusion results from the application of what is said to be the rule of the civil law, and the rule of the common law, as applied to cases of this character. Some States apply one rule and some the other. In the case in 68 Md., the Court applied what is called the rule of the civil law, and that has occasioned the State of Maryland to be classified as one of those adopting that rule. But after all, each case is controlled by its peculiar facts and railroad cases are treated as a special class. Some text writters say there is no such thing as separate rules, but that what is called the rule of the civil law comprehends the principle announced as the common law rule, and that the distinctions are made in applying the rule to urban property. 20 L. R. A. (N. S.), page

155 note. The rule of the civil law is, generally speaking, that the owner of the lower land holds it with a servitude for the natural flow of surface water as a right in the owners of the upper land; while the common law rule holds that surface water is a common enemy, which can be fought as best it may. Then again some jurisdictions have held that even in urban property the obstruction of the flow of the surface water cannot be interrupted without drainage in such a manner as will avoid loss or damage to the adjoining lot owner. L. R. A. 1917 F 942.

Of course, the right to have surface water flow over lower land is applied in any case only when there has been no grading of the land, and its natural topography remains undisturbed, for the reason that if the flow of surface water over lower land is the result of any interference with the natural fall and flow of the water, then it is such conduct on the part of adjoining land owners as will justify the owner of the lower land in employing any means he sees fit to dispose of this lawful discharge of water on his property.

The testimony in this case discloses that the lots owned by Davenport and Gross respectively had been graded to a greater or less extent around the foundations of the bungalows while erecting them. And so far as the fronts of the lots are concerned, with reference to the bed of Barrington road, the grading is quite considerable. But the elevations of the surface soil on the Gross lot as made and testified to by the surveyor, clearly shows that beginning with the south wall of his bungalow the surface becomes lower as you go towards the south end of this lot, and taking the elevations of the south line of his lot, and running north they are lower in spots or pockets. Mr. Gross has testified that ashes have been placed along the rear of his lot, but only on the flower beds. How much of the uneven surface is due to this condition does not appear definitely; although Mr. Davenport says in his testimony that it has obstructed the flow of water and tends to hold it on the Gross lot. But if the flow of the surface water is to the east or the northeast over the Gross lot, then the grading from the south line of his bungalow can have no other effect than to cause the surface water to accumulate in about the centre of the rear of his lot. The elevations disclose depressions varying in inches at this point, and the flow of this water is diverted from what would be its natural course towards the northeast, and made to run almost directly east over the Davenport lot. If this is the situation (and the measurements made would seem to place it beyond doubt), then the natural lay of the land has been interfered with, and would make the flow of water, which is concentrated on the Gross lot, and deflected over the Davenport lot, an unlawful flow of water which would justify Davenport in obstructing and diverting it in whatever manner will protect his property.

The section of the city in which these parties reside is now a thickly settled suburban locality. The lots are improved by detached houses, so that the urban rule covering the flow of surface water would be applicable in this case. Whether it is what is sometimes called the common law rule, (40 Cyc. 642), and in some jurisdictions the Massachusetts rule, which holds that surface water is a common enemy, and can be fought as best it may; or the common law rule (21 L. R. A. 593 note); with the recognized qualification in some jurisdictions that even in urban property as distinguished from rural land, the owner of the lower land cannot interrupt the flow of surface water without providing protection to the owner of the upper land. We find from the evidence in this case that since digging the blind ditch, there is no complaint other than the damp and soggy character of the surface over certain portions of the rear of the Gross lot after a heavy rain.

Under this state of facts it is the opinion of the Court that the defendant has met the obligation imposed upon him under any rule of law applicable to the case, and that the owner of the lower lot has discharged his duty to the owner of the upper lot.

The Court finding, first, that the natural surface of the Gross lot has been changed and that an artificial surface condition has occasioned the water to flow as it did over the lot of the defendant; and secondly, that in addition to constructing the concrete wall, the defendant has dug a ditch to carry off any accumulation of water which might result from building the wall, an order will be signed dismissing the bill of complaint, with costs to the defendant.